UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| BORRELL TECHNOLOGY, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-cv-1088-SEB-VSS |
| | ) | |
| INDIANAPOLIS HOUSING AGENCY, | ) | |
| Defendant. | ) | |

ENTRY DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on the parties' cross motions for summary

judgment regarding Plaintiff's claim that Defendant failed to make a contractually-

mandated incentive payment to Plaintiff under the terms of a service contract.  Defendant

also moves for summary judgment on Counts II and III of Plaintiff's Complaint.  For the

reasons outlined below, we DENY the parties' cross motions for summary judgment,

GRANT Defendant's motion for summary judgment on the Count II tort claims of fraud

and misrepresentation and DENY summary judgment on the Count III unjust enrichment

claim.

Factual Background

Plaintiff Borrell Technology, Inc. ("BTI" or "Contractor") is an Illinois

corporation with its principal place of business in Chicago.  BTI provides training,

consultation and management services for public housing entities, such as the

Indianapolis Housing Agency ("IHA" or "Agency").  The plaintiff's administrators

include Lynne Borrell, founder, president, chief executive officer of BTI and signatory to the BTI/IHA contract ("Contract"), and Jerry Borrell, vice-president.         Defendant, IHA, is a Public Housing Agency ("PHA"), as that term is used by the federal Department of Housing & Urban Development ("HUD").  IHA is also considered a municipal corporation under Indiana law.  See Ind. Code § 36-1-2-10 (defining a municipal corporation as a "unit, school corporation, library district, **local housing authority** ... or other separate governmental entity that may sue and be sued) (emphasis supplied).  IHA's principal offices are located at 1919 North Meridian Street, Indianapolis, Indiana.  Chavis Decl. ¶ 3.

IHA's mission is to provide safe and affordable housing to low-income citizens of Marion County, and to that end, the agency administers a Section 8 program in Indianapolis and throughout greater Marion County.  A HUD Section 8 program provides rent subsidies for low-income persons, pursuant to 42 U.S.C. § 1437f.  Chavis Decl. ¶ 3. The statute authorizes a voucher distribution scheme.  A fixed number of Section 8 vouchers is allocated annually by HUD to participating public housing agencies across the nation.  Each public housing agency, in turn, distributes its allotment of vouchers to eligible recipients.  In some cases, the rent subsidies are tenant-based, that is, eligible tenants receive vouchers which are used to pay rent for qualified housing of their choice. In other cases, the subsidies are project-based, where vouchers are directed towards the owners of pre-qualified rental units.  In both cases, the vouchers are ultimately redeemed by owners of qualified rental units for cash.  Compl. ¶ 7.         During the period in which

BTI and IHA were dealing with one another, Patrick E. Chavis, IV, ("Chavis") was the General Counsel and Deputy Executive Director of the IHA and signatory to the BTI/IHA Contract. Chavis testified that around the time of the Contract with BTI, IHA's Section 8 program had approximately 6,500 vouchers which it administered from its North Meridian Street office and the program was considered a "standard performer." Chavis Decl. ¶ 8.

*Events Leading up to the Initial Contract*

A public housing agency which administers a Section 8 program is responsible for identifying prospective voucher recipients within the area it serves, certifying eligibility of prospective participants prior to accepting them into the program, recertifying each recipient's eligibility on an annual basis, and physically inspecting the premises to ensure they meet the required minimum housing quality standards set by federal law. On a national scale, the demand for Section 8 vouchers exceeds the supply. Thus, HUD has a policy of monitoring utilization and makes this assessment annually under the auspices of the Section Eight Management Assessment Program ("SEMAP"). Using data that the PHA submits to HUD, it computes a SEMAP score and then uses these scores to identify PHAs that are not effectively administering their Section 8 programs. A PHA that fails to use its allotted vouchers faces a potential reduction in allocation in future years. Additionally, if a distributed voucher is found to be in non-compliance with applicable eligibility, certification, recertification, and property inspection requirements, HUD deems them "not utilized." Compl. ¶¶ 10-11. A collateral result of the loss, or

"recapture," of vouchers from one PHA to another is the permanent loss to the PHA of

the monthly administrative fee associated with the voucher.  Compl. ¶ 12.

Around August 2001, IHA determined that, with the help of a consultant, it needed

to reorganize the management operations of its Section 8 Program[1]  Def.'s Br. in Supp. of

Mot. for Summ. J. at 3.  Mr. Chavis personally managed the solicitation of a consultant,

preparing initial and amended Requests for Proposal ("RFP").  Chavis Decl. ¶ 5.  The

initial RFP was issued September 13, 2001 but did not generate any bid for services;

potential vendors hesitated to respond with a proposal apparently because the time for

performance requested in the RFP was unrealistic.  Chavis Decl. ¶ 7.  Chavis amended the

RFP to invite submissions from Section 8 consultants "to manage the IHA voucher

utilization operations ... [w]ithin a reasonable time period, but no later than December 31,

2001," adding that " the Contractor must use their [sic] best efforts to assist the Section 8

Program in reaching the 97% voucher utilization level" but that "IHA is aware that due to

time constraints, it may not be feasible for a potential Contractor to assure the Agency

that the goal will be met"[2] (emphasis in the original).  The RFP set the contract term as

_____

[1]One month later, in late September 2001, IHA received a formal warning letter from HUD.  HUD informed IHA that it had analyzed IHA's voucher utilization for the fiscal year and that utilization rates were below 90%.  If IHA's utilization rate for the coming year remained below 95%, HUD would have had the authority to reduce the units and funding.  Pl.'s Ex. D.

[2]The RFP listed the following operational tasks, here summarized: establish an operational action plan and report, make staffing recommendations, utilize the current staff to the greatest extent feasible, and critically manage the voucher reutilization efforts so that the Program would increase its effectiveness, efficiency and service to the Indianapolis community.  Pl.'s Ex. E; RFP.

"up to a six (6) month term," with an option to renew for another six (6) months.  In the paragraph entitled "Pricing," the RFP requested that the Contractor propose a "payment structure of all fees, including any incentive-based service fees, for performance of its duties under the Contract."  Pl.'s Ex. E; RFP.

IHA received only one proposal in response to its request – the one from BTI.  Mr. Chavis and Ms. Borrell entered into contract negotiations.  Chavis Decl.¶ 22 ; Borrell Decl.¶ 21.  Ms. Borrell asserts in this lawsuit that the BTI "Rate Schedule to Include Fees, Reimbursables, and Profit and Overhead" clearly provided for an incentive payment, based on a percentage of the cost of the proposed contract for achievement of specified contract goals, citing the following provisions in support of that claim:

> **Incentive for Achieving 95% of Goals**; 15% of Contract Cost     $23,749.62
> **Incentive for Achieving 100% of Goals**; 25% of Contract Cost    $39,582.70[3]

Similarly, she maintains, the Rate Schedule included the following late fee provision:

> 1 1/2% of invoiced amount late fee and interest will be charged each month on all invoices outstanding more than 30 days.

See Borrell Decl. ¶ 19; Pl.'s Exs A-G/F.[4]  Ms. Borrell does not claim that she and Mr. Chavis actually negotiated the incentive payment provision; rather, she asserts that "Chavis objected neither to the incentive payment provision nor to the 1½% per month interest/late fee provisions in BTI's proposed Rate Schedule."  Borrell Decl. ¶ 21.  Mr.

---

[3]The original bid proposed a total cost of contract of $158,330.79, a figure that was revised downward during negotiation of the Contract.  Pl.'s Ex. F.

[4]We note that Exhibit F is similar, but not identical, to Attachment A/B of the Initial Contract, see infra.

Chavis and Ms. Borrell agree that they did negotiate the length and cost of the Contract, reducing the term from six (6) to three (3) months, and lowering the proposed cost to an amount not exceed  $77,000.  The scope of services originally referenced in the agreement was also reduced.  Chavis Decl. ¶ 23.  Mr. Chavis maintains that "no discussions of or agreements on incentive bonuses, interest penalties, etc. were addressed in these negotiations" and that "an incentive bonus was never agreed to and did not become part of the contract."  Id. ¶¶ 22, 29.

Ms. Borrell and Mr. Chavis, acting on behalf of IHA, signed the Contract on October 11, 2001.

*The Initial Contract*

The initial Contract provided for a "firm, fixed fee" contract, the cost of which was not to exceed $77,000, and a term of three (3) months:

> 4.02.  The term of this Contract shall be for three (3) months unless further extended by the parties hereto.
>
> 6.01.  The Agency shall compensate the Contractor for services as specified in Attachment A/B that is attached hereto and incorporated by reference herein as part of this Contract.  Agency shall pay Contractor at the rate described in Attachment B, Fees.  Compensation shall not exceed seventy-seven thousand dollars ($77,000.00).
>
> 6.02.  The intent of this Contract is for the Agency and the Contractor to enter into a firm fixed fee Contract with no provision for reimbursable expenses except as provided in the RFP response which is made a part of this agreement as Attachment A, Scope of Services.

Def.'s Ex. 4; Initial Contract §§ 4 (Terms of Contract), 6 (Compensation).

According to § 1.01, the parties contracted to "faithfully and diligently perform the Services hereinafter set forth in Attachment A, Response to the RFP, in accordance with the terms and conditions contained in this Contract." Attachments A and B, respectively, set out  the Scope of Services and the Fee Schedule, and also include the controverted incentive provision.

On a separate page of the agreement, immediately preceding the Attachments, under the title, "Contractual Fees," the following provision recites:

> Contractor's fees shall be based on its hourly rates and reimbursement schedule contained within the Contractor's submittal; incorporated herein by reference.  Fees for any additional time, services and incentives, as may be later required, shall be negotiated at a later date.

Initial Contract; Contractual Fees, p. 25.

The incorporation of the Attachments into and as part of the Contract is referenced at various points throughout the Contract, but Section 20.02 expressly provides:

> This instrument, including all Attachments attached hereto, which are made part of this Contract, contains the entire agreement between the parties and all prior negotiations and agreements are merged herein.  Neither the Agency nor the Agency's Agents have made any representation except those expressly set forth herein, and no rights or remedies are or shall be acquired by the Contractor by implication or otherwise unless expressly set forth herein.  The Contractor hereby waives any defense it may have to the validity of the execution of this Contract.

§ 20.02.

As noted above, Attachment A/B incorporates the Scope of Services and Fee Schedule.  The "Scope of Services" section provides:

7

The following scope of services is based on the original RFP solicittion [sic] and Contactors [sic] response (included by reference) thereto, an [sic] shall include the following:
1.      Contract Administration (Bid Task 1)
2.      Day to Day Program Management (Bid Task 2)
3.      Evaluation of IHA's Existing Section 8 Program Administration (Bid Task 3).

The Fee Schedule is set out in spreadsheet form in three distinct sections: (1) Total Costs (Fees Only) for the three tasks referred to in the Scope of Services, plus a fourth task, captioned "Recommendations for Improvements" in the Contract; (2) Reimbursable Direct Costs; and (3) Payment Schedule.

The bottom right-hand section of the Fee Schedule lays out the "Payment Schedule" section, which specifies the invoicing schedule by task, e.g. payment for Tasks 1 and 2 is to be invoiced monthly, for six months, on the 25th of each month. At the bottom of this section, in bold print, the formulas for two incentive bonuses are listed as follows:

**Incentive for Achieving 95% of Goals**; 15% of Contract Cost     $11,548.61
**Incentive for Achieving 100% of Goals**; 25% of Contract Cost     $19,247.68

On the final line of the Attachment, in fine print, is the provision regarding late fees:

1 1/2% of invoiced amount late fee and interest will be charged each month on all invoices outstanding more than 30 days.

Attachment A/B, Fee Schedule.

We note that both incentive calculations are tied to the "total cost (fees only)" amounts in the Contract, not to additional "reimbursable direct costs."

8

Section 7 of the Contract deals with the Method of Payment,  providing as follows:

> Payment for the proper performance and Agency approval of the
> Services, and Additional Services or Reimbursable Expenses, if
> included in Scope of Services, shall be commensurate with the
> scheduled progress of the work as evidenced by the timely receipt of
> the Agency approved Reports and services and shall be contingent
> upon receipt by the agency and invoice for payment.  The Invoice
> shall certify the total cost of the Services rendered to the project to
> date, the total cost of Reimbursable Expenses, if allowed, rendered to
> the project to date, the cost of Additional Services rendered to the
> project for that billing period. [ . . ]

§ 7.01, Method of Payment.

*Amendments to the Contract*

The initial Contract was subsequently amended three times, conforming in each

instance with the required procedures outline in § 16 of the original Contract, which

states, in pertinent part:

> The Agency may consider it in its best interest to change, modify or
> extend a term, condition or covenant of this Contract or require the
> Contractor to perform additional services that are not contained
> within the Scope of Services as set forth in Attachment A.  Any such
> change, addition, deletion, extension or modification of Services
> may require that compensation paid to the Contractor by the Agency
> be proportionately adjusted, (increase or decrease), to reflect such
> modification in the Scope of Services.  If the Agency or Contractor
> mutually agree to any change or modification of this Contract, the
> modification shall be incorporated by written amendments to this
> Contract.

§ 16; Amendments.

The first amendment, signed November 29, 2001, increased the pay out under the

Contract to an amount not to exceed $88,973, based on the total cost of additional

9

personnel.  The amendment also referenced the Fee Schedule contained in Exhibit B of

the Contract, increasing the total costs (fees only) from $76,990 to $86,886.  No alteration

was made to the incentive calculations. Def.'s Ex. 5; First Amendment.

The second amendment, signed on February 12, 2002, incorporated the following

changes:  (1) the term of the Contract was extended to March 6, 2002, or until all funding

has been exhausted, whichever occurred first; and (2) the Contract amount was increased

by $100,000, to an amount not to exceed the total of $188,973.  With this amendment, no

new Fee Schedule was attached.  Def.'s Ex. 6; Second Amendment.  The IHA Board of

Commissioners ("Board") was required to approve this second amendment because the

amount of the contract now exceeded $100,000, as detailed in the RFP, which specified

that any contract over $100,000 must have Board approval, and any successive increase

over 10% of the amount approved by the Board must re-submitted for approval.  Def.'s

Br. at 8.  No adjustment in incentive payments was made as part of the second

amendment.

The Contract was amended a third, and final, time on April 2, 2002.  These

modifications responded to BTI's identification of additional problems needing correction

within the Section 8 Program in order to increase utilization and to solve program

compliance issues.  The Board met on March 19, 2002, and approved an extension of the

Contract through July 2002 and an additional amount not to exceed $520,704, thereby

raising the total amount of the Contract to $709,677.

Ms. Borrell states in her sworn declaration that she and Mr. Rufus "Bud" Myers,

the Executive Director of IHA at the time, had discussed the incentive provision prior to the Board meeting and, following the meeting, Mr. Myers reported to her that some of the Board members objected to the incentive provision and wanted it removed from the contract.  Ms. Borrell testifies that she told Mr. Myers that BTI would not agree to removing the incentive provision from the contract and would not enter into the July 2002 contract amendment if the provision were removed.  According to Ms. Borrell, Mr. Myers assured her that BTI's performance was excellent and that BTI would receive the incentive payment if it agreed to the contract extension.  Pl.'s Ev.; Borrell Decl. ¶31.  It appears from the Board meeting minutes that the subject of the incentive bonus was, in fact, discussed by the Board as a matter of concern.  Specifically, Board member Patricia Gamble-Moore reportedly asked that the incentive payment offered at the end of the contract be reconsidered, "[a]nd the contract [be] amended to eliminate the incentive payment."  Board member Aaron Haith "noted that while we are removing the incentive in the initial contract that he did not want to be precluded from awarding an incentive if the performance deemed one."  Def.'s Ex. 9; IHA minutes, pp.9-10.

The contract extension was agreed to at the March 19, 2002, meeting, providing that "all other terms, conditions and covenants of the Contract are hereby incorporated by reference and shall remain in full force and effect, except as modified in this Amendment."

A copy of Attachment A/B was not included in the third contract amendment, although the amendment expressly recited:

11

    4.  That all other terms, conditions and covenants of the Contract are hereby incorporated by reference and shall remain in full force and effect, except as modified in this Amendment.

Def.'s Ex. 10; 3rd Amended Contract.

    BTI performed all the tasks set forth in the Contract, as amended, within the limitations of the final not-to-exceed cost of $709,677.  The final amount due BTI of $612,064 has been paid in full by IHA.  Borrell. Decl. ¶ 28.

*Post Contract Activities*

    On August 26, 2002, Mr. Borrell on behalf of BTI wrote IHA inquiring about the incentive payment, stating that the Contract provided for a bonus of 15% of the contract cost if BTI met 95% of the proposed goals and 25% of the contract cost if 100% of the goals were met.  Mr. Borrell calculated the incentive payment to which he claimed BTI was entitled using the final contract cost of $612,064, arriving at a bonus amount of either $91,809.59 or $153,015.99, depending on the precise success rate figure.  Mr. Borrell indicated that BTI was of the view that it had met at least the 95% goal because "several events beyond our control prevented us from reaching 100% of the goals."  Pl.'s Ex. E ; Def.'s Ex. 12.  The uncontrollable events which precluded BTI's higher achievement level, according to BTI, stemmed from IHA's alleged misrepresentations of its voucher utilization rate in prior years, misrepresentations upon which BTI necessarily relied, and the intentional and improper withholding of 600 tenant-based vouchers during 2002 .  Borrell Decl. ¶¶ 35, 39, 44.

    Executive Director Myers promptly responded to Mr. Borrell's letter, indicating

12

that he was forwarding "copies of the agreement to ... Finance and Legal for review,

analysis and recommendation."  Once the process of "internal confirmation of the

information [Borrell] provided was complete," Mr. Myers assured Mr. Borrell that they

would "present [their] findings and analysis to the IHA Board."  After these "preliminary

steps [were] taken," Mr. Myers promised to follow up with Mr. Borrell on BTI's request

for the incentive payment.  Mr. Myers identified Mr. Chavis as the coordinator of the

incentive bonus review process.  Pl.'s Ex. F; IHA letter.   On November 12, 2002, Mr.

Borrell again e-mailed Mr. Chavis concerning the status of the incentive payment review

process, to which Mr. Chavis responded with an apology for not having had time to

analyze the issue.  Mr. Chavis also told Mr. Borrell that "if we confirm the qualifications

for a bonus, it still will be subject to Board approval."  Pl.'s Ex. G; Borrell E-mail.

Seven months after Mr. Borrell's August 26th request for payment of the incentive

amount, Ms. Borrell wrote Mr. Myers requesting his "immediate attention" to the bonus

to which she believed BTI was entitled under their contract.  Ms. Borrell indicated that if

she failed to receive a "meaningful response within thirty days of this letter," she would

assume IHA had no intention of paying the incentive bonus.  Pl.'s Ex. H.

On October 7, 2003, IHA's counsel, John M.T. Chavis, II, wrote to counsel for

BTI explaining that IHA was denying BTI's request for payment of an incentive for two

reasons:  (1) that BTI was "fully aware that the incentive bonus provision was removed

from the contract pursuant to the actions of the IHA Board of Commissioners"; and (2)

BTI continued to perform under the contract in spite of knowing the contract had been

13

modified to withdraw the incentive payment and without disputing its removal.[5]  Pl.'s Ex.
R; Response Br.  BTI responded to Mr. Chavis's assertions, denying that it "knew" the
provision had been removed and maintaining moreover that IHA "grossly misrepresented
its voucher utilization rate not only to BTI, but also to HUD, by submitting inaccurate
annual recertification data."    Pl.'s Ex. S.

The invoice for the incentive payment and accrued late fees remains unpaid and is
the subject of this breach of contract action, which was filed on June 28, 2004.  Cross
motions for summary judgment were filed and fully briefed by April 7, 2005.

<u>Legal Analysis</u>

Summary judgment is proper "if the pleadings, depositions, answers to
interrogatories and admissions on file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the moving party is entitled to a
judgment as a matter of law."  Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
322 (1986).  Because we have before us cross motions for summary judgment and the
same Rule 56 standards apply, our review of the record requires us to draw all inferences

---

[5]Mr. Chavis stated, in IHA's Answer to Plaintiff's Interrogatory No. 1, responding
to BTI's request for the legal theory supporting IHA's contention that the incentive
payment provision was nonexistent:
> "In the ultimate initial contract IHA agreed to a set 'not to exceed'
> fee rate and the contract further indicated that the parties could
> negotiate a bonus at a later date.  There was never a subsequent
> agreement negotiated on a bonus fee amount."
Pl's Exhibit; IHA Answers to Plaintiff's Interrogatories.

in favor of the party against whom a particular issue in the motion under consideration is

asserted.  See O'Regan v. Arbitration Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001);

Allstate Ins. Co. v. Tozer, 298 F.Supp.2d 765, 767 (S.D. Ind. 2003).

The parties have identified no material disputed facts, which, theoretically at least,

paves the way for summary resolution of the issues in this case as a matter of law.

However, summary judgment in contract actions is inappropriate if the Court must

resolve issues involving an inquiry into the state of mind of the contracting parties.  One

example of such a state-of-mind problem involves contract terms that are sufficiently

ambiguous as to necessitate a determination of the intent of the parties.  Wright, Miller &

Kane, Federal Practice and Procedure: Civil § 2730.1 (3d ed. 1998).  In interpreting a

written contract, the Court must give effect to the mutual intention of the parties as it

existed at the time of the execution of the contract.  If their mutual intention cannot be

determined from the facts before the Court, then it would be improper to grant summary

judgment, despite both parties having moved for it.  Id. § 2720; R.J. Corman Derailment

Services, LLC v. International Union of Operating Engineers, Local Union 150,

AFL-CIO, 335 F.3d 643, 647 (7th Cir. 2003).

*Applicable Rules of Contract Interpretation*

Contract language is to be given its plain and ordinary meaning and, absent

ambiguity, we must rely on the text and may not look beyond the four corners of the

document to determine the parties' intentions.  Tri-Central High School v. Mason, 738

N.E.2d 341, 344 (Ind. App. 2000).  The contract is to be read in its entirety, avoiding

15

reliance on selected portions of a contract to the exclusion of other contractual provisions, so as to harmonize all the parts of the agreement.  First Fed. Sav. Bank v. Key Markets, Inc., 559 N.E.2d 600 (Ind.1990); Grandview Lot Owners Ass'n, Inc. v. Harmon, 754 N.E.2d 554, 557 (Ind. App. 2001).

Where a reasonable person would find a contract susceptible of more than one construction, an ambiguity exists.   A contract is not ambiguous, however, merely because the parties dispute its meaning.  Ecorp, Inc. v. Rooksby, 746 N.E.2d 128, 131 (Ind. App. 2001).  It is a well-settled principle of contract construction that any ambiguities in a contract are to be strictly construed against the party who prepared the contract, in this case, IHA.  MPACT Const. Group, LLC v. Superior Concrete Constructors, 802 N.E. 2d 901, 910 (Ind. 2004).   Resolving an ambiguity in the contract might require consideration of parol evidence, but only if the ambiguity cannot be cleared up by a careful reading of the contract or when it is apparent from the words of the contract that the parties had never agreed on its essential terms.   Amoco Oil Co. v. Ashcraft, 791 F.2d 519 (7th Cir. 1986).

While holding contrary interpretations as to the precise meaning and import of the incentive payment provision in their agreement, both parties nonetheless assert that this contract term is unambiguous.  BTI maintains that the contract language unambiguously guarantees the payment, and IHA's failure to pay the bonus in the amounts requested in the August 26, 2002 letter from Mr. Borrell to Mr. Myers is a breach of their contract. IHA argues in response that the contract just as clearly and unambiguously never required

payment of any incentive bonus, but, if we were to reject that proposition, IHA alternatively contends that BTI's performance did not qualify it for payment of an incentive bonus.

Our analysis begins with an attempt to ascertain the parties' intent with regard to the incentive bonus payment. The background facts leading up to the agreement disclose that after IHA issued its amended Request for Proposal, to which BTI responded, BTI submitted a proposed scope of services under the contract, together with a proposed term for delivery of services under the contract and a resultant contract price. Because the RFP elicited from prospective contractors a "payment structure of all fees, including any incentive-based service fees, for performance of its duties under the Contract" [Pl.'s Exs. A-G/E], BTI also attached a Rate Schedule that included an incentive payment and late fee provisions in its bid for the contract. Pl.'s Exs. A-G/F. The structure of the proposed incentive payment was 15% of the contract cost if BTI achieved 95% of the contract goals and 25% of the contract cost if 100% of the contract goals were met. The proposed rate schedule was the blueprint for what ultimately became Attachment A/B to the signed contract, although BTI's originally proposed dollar amounts were reconfigured following negotiations with IHA to reflect a narrower scope of services, and consequently, a reduction in the total amount of the costs/fees. Those reductions impacted the incentive payment provision, because the proposed incentive payment was tied to the total contract cost figure.

The Rate Schedule was set out in chart form in Attachment A/B and appended to the contract immediately following the signature page; the attachment was captioned as follows:

ATTACHMENT A/B
SCOPE OF SERVICES
FEE SCHEDULE

In various places in the text of the contract, Scope of Services is referenced in connection with Attachment A.[6]   In the absence of any such specific reference to the Fee Schedule and Attachment B, we have reasonably inferred that Attachment B does in fact relate specifically to the Fee Schedule.  The Fee Schedule chart is divided into three parts: the major portion contains a breakout of the costs connected with each of the four contractual tasks to be performed by BTI; at the bottom of the page, in two smaller, rectangular and adjacent blocks are, on the left side, the itemized Reimbursable Direct Costs (excluding fees) and  the Payment Schedule for each invoiced task on the right side.  This right lower box also sets out the terms for calculating incentive payments.  (We have appended a

---

[6]  For example, on page 1 of the Contract:
     "Whereas, the objectives of this Contract is (sic) for Contractor to provide
     long rang and strategic planning and other related services for the Agency as
     set forth in Attachment A, Scope of Services, response to Agency RFP."

copy of "Attachment A/B" to this order, in view of its importance to our analysis and to facilitate our discussion of the issues.)

There is every indication that the contracting parties fully intended to make Attachment A/B a part of their agreement.  In addition to its placement in the context of the agreement, at least two provisions in the contract expressly state the parties' intent that it be incorporated by reference of the Attachment: Section 6.01 as well as the Contractual Fees provision.[7]  Further, its provisions give substance to other parts of their agreement, for example by laying out the precise dollar amounts associated with the work BTI agreed to perform.

We are slowed in reaching this conclusion, however, by the fact that apparently a copy of Attachment A/B was not physically attached to either the second or third amended versions of the Contract and there are no explicit references to its being continued as part of each of the amended documents.  Thus, we must address the issue of whether Attachment A/B survived each revision so as to remain a part of the parties'

---

[7]  Section 6.01 of the initial contract, which deals with compensation, states:
    The Agency shall compensate the Contractor for services as specified in Attachment A/B that is *attached hereto and incorporated by reference herein as part of this Contract*.  Agency shall pay Contractor at the rate described in Attachment B, Fees ... [emphasis supplied].
The "Contractual Fees" Statement provides:
    Contractor's fees shall be based on its hourly rates and reimbursement schedule *contained within the Contractor's submittal; incorporated herein by reference*.  Fees for any additional time, services and incentives, as may be later required, shall be negotiated at a later date. [emphasis supplied].

19

contractual agreement.  To resolve this issue, we consult well-established principles of Indiana law.

Under Indiana law, "[i]t is an old rule" that "where a contract embraces the entire substance of a former contract, with some variations, the first contract is merged in the second.... [A] written contract is presumed to embody all prior negotiations and agreements."  Skaggs v. Merchants Retail Credit Ass'n, 519 N.E.2d 202, 204 (Ind. App.1988).   In Calvary Temple Church, Inc. v. Paino, 827 N.E.2d 125, 135 (Ind. App. 2005), the Indiana Court of Appeals recently elaborated:

> The law recognizes two separate, yet closely related
> doctrines: substituted contract and novation.  Indeed,
> the two doctrines differ only in the respect that a nov-
> ation requires the existence of a new party who was not
> a party to the first contract.... [T]he term 'substituted
> contract' is used when one or more of the original
> parties but no new parties are involved in the transaction.
> The term 'novation' requires the presence of a new party.
> 13 Corbin on Contracts § 71.1(2), at 402 (rev. ed. 2003).
> Because in this case there was not a new party to the
> contract, the applicable doctrine is that of substituted
> contract, which has been defined as '[a] contract made
> between parties to an earlier contract so that the new one
> takes the place of and discharges the earlier one."  Black's
> Law Dictionary 349 (8th ed. 2004).

The Court of Appeals, in Calvary Temple,  827 N.E.2d at 136, also set out the test for determining whether a substituted contract has been created under Indiana law, noting that it is the same test that is applied with regard to a novation, which requires: "(1) a

valid existing contract, (2) the agreement of all parties to a new contract, (3) a valid new

contract, and (4) an extinguishment of the old contract in favor of the new one."

Applying this test to the case at bar, it is clear that all these elements are satisfied

and, as a result, we can conclude that Attachment A/B merged into each successive

version of the parties' amended agreements and that the final version became the

substituted contract.  Our conclusion is reinforced by the fact that the parties have not

disputed the validity of the initial contract as a whole to which they were both signatories,

nor have they disputed the validity of the subsequent amendments, which appear to have

been executed in each instance in full compliance with the contractual requirements for

such.  Further, it is indisputable that the referenced services by BTI were performed

pursuant to the contract and the payments by IHA satisfied its contractual obligations.

Finally, nothing in the amendments themselves indicates or otherwise suggests that the

the prior contractual terms were not extinguished in favor of new ones with each

amendment; in fact, the following provision in each of the amendments states as much:

> That all other terms, conditions and covenants of the Contract are
> hereby incorporated by reference and shall remain in full force and
> effect, as modified in this Amendment.

Def.'s Exs. 5, 6, 10.

Thus, it is clear that the third amended contract is the substituted agreement,

replacing all prior versions including the incentive payments provision in Attachment

A/B.

We next consider the meaning and significance of the language in the "Contractual Fees" provision, which as we have previously noted, immediately preceded Attachment A/B in the written agreement; it provides:

> Contractor's fees shall be based on its hourly rates and reimbursement schedule contained within the Contractor's submittal; incorporated herein by reference. *Fees for any additional time, services and incentives, as may be later required, shall be negotiated at a later date*. [emphasis supplied].

The second sentence of this section is a puzzle, susceptible to (at least) two interpretations: one construction is that incentive payments were promised, if the performance criteria were met by BTI ("as may be later required"), but in any event, the specific amount would be subject to future negotiations ("shall be negotiated at a later date"). Stated otherwise, in order to receive incentive payments, two conditions precedent must be satisfied: whether BTI's performance would have to be deemed to warrant such payments beyond the original contract terms and the precise amount of the payment would have to be negotiated between the parties.

A second, plausible interpretation of this phrase would make any entitlement to incentive payment entirely contingent upon future developments ("as may be later required"), and, subject to negotiation. Under this construction, everything about incentive payments is left up in the air.

In support of her construction of this provision – that the incentive payments were a clear obligation under the contract – Ms. Borrell stated in her sworn declaration that,

during the negotiations over the final terms of the contract, only two material changes to the original proposal made by BTI in response to the RFP were the subject of negotiations between BTI and  IHA and both were included in the final contract: (1) the reduction in the contract term from 6 months to 3 months; and (2) the corresponding reduction in the contract cost to an amount not to exceed $77,000.  Borrell Decl. ¶ 23. She infers from the fact that "Mr. Chavis objected neither to the incentive payment provision nor to the 1 ½% per month interest/late fee provisions in the BTI's proposed Rate Schedule" that the  incentive payment proposal remained as it appears in Attachment B and became a binding provision in their agreement.

In contrast, Mr. Chavis cites Section 6.02 in support of his position, which articulates the "intent of the Contract" as a "firm fixed fee" contract.  Thus, Mr. Chavis argues, it was clear to BTI, and in fact a condition of their agreement, that IHA intended to spend no more than $77,000, and any amount beyond that limit could not have been approved without a written amendment and Board approval, which had neither been sought nor given.  Chavis Decl. ¶ 27.  Mr Chavis points to the "Contractual Fees" provision in the initial contract to demonstrate that, "[u]nlike in a flat fee contract, the BTI agreement provides that incentive bonuses, as well as other potential payment issues, would be negotiated at a later date" and, because [a]n incentive bonus was never agreed to ... [it] did not become a part of the contract."   Id. ¶ 29.  "Moreover any proposed incentive fee payments were specifically excluded from the final contract and were to be

discussed and negotiated at a later date.  There were some later discussions regarding an incentive fee but no amendments were ever made which included an incentive fee payment."  Id. ¶ 34.

In the face of this ambiguity, the parties have invoked certain parol evidence[8] to buttress their respective constructions of the agreement, citing, for example, the IHA Board meeting minutes and the conversation between Ms. Borrell and Mr. Myers on March 19, 2002.  However, the October 7, 2003 letter from IHA counsel to BTI appears to controvert Ms. Borrell's assertion that she was not present at the Board meeting at the time the incentive provision was discussed and that she told Mr. Myers she would not agree to amend the contract a third time if the incentive payment were removed.  See Pl.'s Response, Ex. R (letter from IHA counsel, Chavis, to Hetzel, counsel for BTI) and Ex. S (letter from Hetzel to Chavis).  In the final analysis, however, this evidence does little to resolve the contractual ambiguities that afflict this contractual provision.

Even if we were to frame the issue in terms of IHA's failure to negotiate the incentive payment rather than its failure to pay the bonus, we are unable to resolve the matter on the basis of the evidence submitted by the parties.  There is evidence, for example, that BTI  initiated the negotiation/payment demand process with its August 26th

---

[8]Plaintiff submits that Mr. Myers statements are admissible as an exception to the parol evidence rule which applies in the case of fraud in the inducement, where a party was "induced" through fraudulent representations to enter a contract.  See Circle Centre Development Co. v. Y/G Indiana, L.P., 762 N.E.2d 176, 179 (Ind. 2002).  BTI, however, has not alleged fraud in the inducement of the contract, thus the exception is inapplicable.

letter to IHA, and evidence that IHA responded saying it would undertake an internal review of the issue, including the figures presented by BTI.  Thereafter, nothing apparently occurred between the parties to resolve the dispute prior to BTI's filing of this lawsuit.

In summary, while there is a clear reference to incentive payments in the text of the  agreement, whether that provision creates an actual entitlement on the part of BTI to receive such a bonus or merely to have the matter negotiated in the future cannot be resolved on the basis either of the express terms of the agreement or the extrinsic, parol evidence.   When evidence presented in support of a motion gives rise to conflicting interpretations, summary judgment is improper.  Neither party has established the indisputability of the facts which would warrant judgment in its favor and the Court is under no obligation to grant summary judgment merely because both parties moved for it. Wright, Miller & Kane, § 2720.

Accordingly, we **DENY** the cross motions for summary judgment presented by Plaintiff and Defendant on the breach of contract claim.[9]

---

[9]Plaintiff has also made a Rule 56(d) request, ancillary to the Rule 56(c) motion.  Federal Rule of Civil Procedure 56(d) provides the following:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.

Upon the necessity of a trial on the breach of contract claim, we shall address this issue at that

(continued...)

*Additional Claims*

BTI has asserted the state law tort claims of misrepresentation and fraud, alleging in Count Two of its complaint that IHA "intentionally, recklessly, or negligently made material misrepresentations of fact concerning the condition of its Section 8 program" which basically prevented BTI from being able to perform at such a level under the contract as to be entitled to the incentive payment bonuses.

IHA advances both procedural and substantive defenses to this claim.  First, IHA invokes the Indiana Tort Claims Act which affords it, as a political subdivision of the State of Indiana, the following two defenses which are applicable here: under that statute, a claimant must file (1) a notice of tort claim; (2) within 180 days of the loss.  The IHA is a municipal corporation, as defined at Section 36-1-2-10 of the Indiana Code.  As a "municipal corporation," the IHA is a "political subdivision."  I.C. § 34-6-2-110(5); I.C. § 36-1-2-13.  The Indiana Tort Claims Act applies to political subdivisions, directing that:

> ... a claim against a political subdivision is barred unless notice is filed with:
>> (1) the governing body of that political subdivision; and
>> (2) the Indiana political subdivision risk management commission created under IC 27-1-29; within one hundred eighty (180) days after the loss occurs.

I.C. § 34-13-3-8.

---

[9](...continued)

time.

Neither of these conditions has been satisfied, says IHA.  BTI neither filed such notice of tort claim against IHA, nor filed it within the required one hundred eighty day time limit.

The failure to file a timely notice has long been recognized as a jurisdictional bar to any tort action against a political subdivision under the Indiana Tort Claims Act. Teague v. Boone, 442 N.E.2d 1119, 1120 (1980); see also, Warfield v. Adams, 582 F.Supp.111, 120 (D.C. Ind.1984).  In tort cases, the date of loss is the date upon which the alleged tort occurred, and the cause of action accrues when the claimant had knowledge of the injury or could reasonably have discovered the injury.   Wehling v. Citizens National Bank, 586 N.E.2d 840 (1992).

IHA makes a convincing showing that BTI had knowledge of a potential fraud or misrepresentation claims, dating back to the September, 2001, Amended RFP and at several times thereafter.  Ms. Borrell herself stated in her declaration that "almost immediately" after commencing work under the initial contract, "BTI ... learned that the condition of the IHA's Section 8 program was far worse than had been represented in IHA's RFP, upon which BTI relied in formulating its contract proposal, including the incentive provision.  Specifically, IHA's representation in the RFP that the utilization of approximately 1,300 additional vouchers would be sufficient to attain a 97% voucher utilization rate was false."  Borrell Decl. ¶ 34. This would seem to suggest that BTI's tort claim allegedly occurred at the time of the false portrayal of the voucher system in the

27

Section 8 program in the RFP.  BTI's allegation that IHA's alleged misrepresentations in the RFP (August 2001) caused it to be unable to perform the contract in compliance with the standards that would have allowed it to receive the incentive payment is further undermined by the fact of the subsequent amendments to their agreement and the resultant extensions of their relationship during which process these allegedly fraudulent misrepresentations were never addressed, revised or redacted from the contract.

BTI rejoins that in fact it did not have a basis for filing a notice of tort claim based on fraud and misrepresentation until it received IHA's letter from its lawyer, John Chavis, denying any obligation to pay the incentive payment.  When BTI's attorney replied by letter dated October 27, 2003, that communication constituted substantial compliance with the notice requirements of Ind. Code. § 34-13-3-8(a).  BTI pegs its loss to the time when IHA formally denied its request to make any incentive payment, that is, on October 7, 2003, maintaining that, because its return letter was sent on October 27, 2003, only twenty days had elapsed within the one-hundred-eighty-day period.  Pl.'s Ex. R

The Indiana Supreme Court, in Wehling v. Citizens National Bank, supra, provides definitive guidance for determining when a cause of action in tort accrues:

> We hold that the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another.

Based on the uncontroverted evidence in this case, we must conclude that the torts of

fraud and misrepresentation based on the pre-contract condition of the IHA's Section 8

department became well known to BTI as soon as it undertook performance under their

initial agreement.  Even if somehow full knowledge on the part of BTI was delayed until

they had a clearer picture of the situation confronting them and had accumulated  more

substantive data as they attempted to perform their contractual obligations, surely if the

situation was as difficult and as different from their expectations as to be a basis for a

fraud claim,  that awareness would have come within a few months after BTI's

performance began in 2001 and in any event long before the October, 2003 exchange of

correspondence between the lawyers brought the dispute to a head.

Thus, it is clear that no tort claim was actually filed, and if we were to construe

some action as constructive notice of such a claim, no such notice came within the 180-

day time limitations.

IHA asserts that the ITCA requires dismissal on the additional ground that, quite

apart from the procedural requirements, a tort claim based on an alleged

misrepresentation by a government employee acting within the scope of his employment,

cannot prevail unless it can be shown that the misrepresentation was intentional, and there

is no evidence adduced in this case to establish that IHA's misrepresentations were

intentional.  See I.C. § 34-13-3-3(13); Parke County v. Ropack, Inc., 526 N.E.2d 732

(Ind. App. 1988) (ITCA immunizes a government entity from liability for

misrepresentation where misrepresentation was unintentional).  In fact, Ms. Borrell, again

29

in her deposition, described the early period of the contract as one in which BTI evaluated the program and discovered inaccurate data, but also stated that the IHA "did not represent their program in reality, I'm not saying it was deliberate or not deliberate . What I'm saying is the numbers were wrong and the premise was wrong and made it virtually impossible to meet a few of the goals they had requested."  Borrell Dep. p. 130. Eric Brown, a BTI subcontractor who assisted with the Section 8 management contract, described a situation where there was alternately a "lack of information and then some of it was that [sic] inadequately or inappropriately or [sic] entered incorrectly.  Brown Dep. p. 100.

This evidence may satisfy a negligence standard, but it clearly does not reflect intentional or deliberate misrepresentations.  Indeed, the terms of the original RFP included the provision stating that "IHA makes not [sic] guarantee or warranty regarding completeness or accuracy of information contained herein.  The scope of requested services are based on current information and are subject to change."  Def.'s Ex. 1; Original RFP.

For these reasons, Plaintiff's claims based on fraud and misrepresentation must be dismissed, both on grounds of failure to comply with the procedural requirements of the Indiana Tort Claims Act and on the basis of the immunity conferred on Defendant by the ITCA.

IHA also contends that BTI cannot establish the essential elements of fraud on the

30

part of the IHA official who prepared the RFP.  Def.'s Reply at 9.  We need not give this assertion detailed discussion based on our prior determinations.  However, we can and do note our substantial doubt concerning BTI's ability to prove (at least) reliance, one of the elements of actual fraud under well-established Indiana law,[10] when the uncontroverted evidence establishes that the Section 8 program was described in detail in the RFP, to which BTI responded when it made its proposals to IHA, including Part C of the Amended RFP which specifically obligated the Contractor (BTI) to "evaluate all aforementioned Core Functions and Programs and, (sic) complete a comprehensive Operational Plan for improvement of the Section 8 Core Functions and Programs in all key areas."  The Contractor was also obligated under the RFP to develop a quality control plan addressing all areas of performance of the Contract and Section 8 Programs. (Amended RFP, 9/20/01, Doc. 52:2)

Finally, in response to BTI's unjust enrichment claim against IHA based on its assertion that it performed valuable and substantial services for the defendant in excess of the scope of work set out in the contract, under circumstances giving rise to a reasonable expectation of payment for those services but for which no payment was made, IHA again objects.  BTI has not claimed that IHA failed to pay the contract price; rather that the

---

[10] "The elements of actual fraud are as follows: (1) a material representation of past or existing facts which (2) was false, (3) was made with knowledge or reckless ignorance of its falsity, (4) was made with intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) proximately caused injury to the complaining party."  Bilimoria Computer-Systems, LLC. v. America Online, Inc., 829 N.E. 2d 150, 155 (Ind.Sup. 2005) citing Wallem v. CLS Indus., Inc., 725 N.E. 2d 880, 889 (Ind.Ct.App.2000).

unjust enrichment occurred when: (1) the defendant did not pay the incentive bonus to which BTI is entitled; and (2) the IHA was earned administrative fees on the vouchers that BTI successfully preserved on the Agency's behalf during the period between the third amended contract and the completion of the contract without compensating BTI for its efforts.

Unjust enrichment is an equitable remedy and, in the words of the familiar maxim, equity will not decree specific performance of a contract that is vague, indefinite and uncertain. <u>Spinsky v.Kay</u>, 550 N.E. 2d 349, 351 (Ind.Ct.App 1990).  "It may, however, in the furtherance of justice, compel a party to do that which in equity ought to have been done, and which was in the contemplation of the parties as expressed in their contract." <u>Wenning v. Calhoun</u>. 827 N.E.2d 627, 629 (Ind.App.,2005).  This claim, like the breach of contract claim discussed previously in this entry, fails as a matter of law because the contract between the parties with respect to the incentive payments is too indefinite in its essential terms.  Though BTI asserts that Mr. Myers promised Ms. Borrell that the incentive payment would be made in exchange for agreeing to the third extension of the contract up to and including July 31, 2002, and though IHA has not directly disputed this assertion, we lack a clear understanding of what exactly this alleged oral agreement entailed, and any information concerning whether Myers was authorized by the Board when he made the promise, and what amount was to be paid by IHA.  We cannot re-write and then enforce the contracts which, so far as we know, the parties themselves did not

enter into.

To recover under a quasi-contract theory, in which a contract is implied by law when by reason, law and natural equity, there is a patent claim for a remedy because one party has been wrongfully enriched at the expense of another, a plaintiff, to be entitled to a recovery on this theory, must show (1) a benefit was rendered to the party sought to be charged, (2) at that party's implied request, and (3) under circumstances in which equity should demand that the person receiving the benefit should compensate the other in order to prevent unjust enrichment. Wenning, supra, at 630. Again, these elements involve issues of material fact foreclosing summary judgment, especially in view of the fact that IHA argues that BTI can show no measurable benefit conveyed to IHA beyond that which was contracted and paid for in full, since, according to its theory of the case, the contract did not guarantee the payment of an incentive bonus and IHA never withheld anything to which BTI was entitled. We cannot determine at this juncture whether the failure to pay the bonus allowed an unjust enrichment to Defendant. For these reasons, we must deny the Defendant's motion for summary judgment on Count III.

## Conclusion

Accordingly, we find that neither party is entitled to judgment as a matter of law on Plaintiff's breach of contract claim and DENY the parties' cross motions for summary judgment. Further, we GRANT Defendant's motion for summary judgment on the Count II tort claims of fraud and misrepresentation, but DENY summary judgment on the Count

33

III unjust enrichment claim.

      IT IS SO ORDERED.


Date: _____
     07/26/2005

                                    SARAH EVANS BARKER, JUDGE
                                    United States District Court
                                    Southern District of Indiana


Copy to:


John M T Chavis II

LOCKE REYNOLDS LLP

jchavis@locke.com


Norman L. Reed

reedsmithlaw@aol.com


Randall MacDonald Wokas

rwokas@att.net


Attachment in three (3) pages:

**ATTACHMENT A/B**

**SCOPE OF SERVICES**

**FEE SCHEDULE**

## <u>SCOPE OF SERVICES</u>

The following scope of services is based on the orginal RFP solicittion and Contactors

response (included by reference) thereto, an shall include the following:

1. Contact Administration (Bid Task 1)

2. Day to Day Program Management (Bid Task 2)

3. Evaluation of IHA's Existing Section 8 Program Administration (Bid Task 3)

Indianapolis Housing Agency
Section 8 Program Evaluation Operations Management

Borrell Technology Incorporated

| Staff | Rate | Task #1 Contract Administration Hours | Cost | Task #2 Day-to-Day Program Management Hours | Cost | Task #3 Evaluation of the IHA's Existing Section 8 Program Administration Hours | Cost | Task #4 Recommendations for Improvements Hours | Cost |
|---|---|---|---|---|---|---|---|---|---|
| **Direct Labor** | | | | | | | | | |
| Project Manager | $ 55.00 | 40.00 | $ 2,200.00 | 40.00 | $ 2,200.00 | 60.00 | $ 3,300.00 | 40.00 | $ 2,200.00 |
| Senior Associate (Eric Brown) | $ 55.00 | 6.00 | $ 330.00 | 150.00 | $ 8,250.00 | 20.00 | $ 1,100.00 | 20.00 | $ 1,100.00 |
| Senior Associate (Kent Watkins) | $ 55.00 | | $ - | | $ - | 40.00 | $ 2,200.00 | 20.00 | $ 1,100.00 |
| ISS (Jerry Borrell) | $ 55.00 | | $ - | | $ - | | $ - | 20.00 | $ 1,100.00 |
| Support staff (4) | $ 25.00 | 10.00 | $ 250.00 | 175.00 | $ 4,375.00 | 20.00 | $ 500.00 | 5.00 | $ 125.00 |
| Staff Assistance | $ - | | $ - | | $ - | | $ - | | $ - |
| Staff Assistance | $ - | | $ - | | $ - | | $ - | | $ - |
| Total Direct Labor | | 56.00 | $ 2,780.00 | 365.00 | $ 14,825.00 | 180.00 | $ 9,300.00 | 105.00 | $ 5,625.00 |
| Fringe | 18.00% | | $ 500.40 | | $ 2,668.50 | | $ 1,674.00 | | $ 1,012.50 |
| G & A | 23.30% | | $ 647.74 | | $ 3,454.23 | | $ 2,166.90 | | $ 1,310.63 |
| Overhead | 37.80% | | $ 1,050.84 | | $ 5,603.85 | | $ 3,515.40 | | $ 2,126.25 |
| **Total Wages** | | | $ 4,978.98 | | $ 26,551.58 | | $ 16,656.30 | | $ 10,074.38 |
| **Consultants** | | | | | | | | | |
| Casteline Associates | $ 8,500.00 | 1 | $ 8,500.00 | | $ - | | $ - | | $ - |
| Total Consultant Costs | | | $ 8,500.00 | | $ - | | $ - | | $ - |
| Subtotal Costs | | | $ 8,500.00 | | $ - | | $ - | | $ - |
| G & A | 23.30% | | $ 1,980.50 | | $ - | | $ - | | $ - |
| **Total Consultant Costs** | | | $ 10,480.50 | | $ - | | $ - | | $ - |
| Total Contract Costs | | | $ 15,459.48 | | $ 26,551.58 | | $ 16,656.30 | | $ 10,074.38 |
| Profit Fees | 12.00% | | $ 1,855.14 | | $ 3,186.19 | | $ 1,998.76 | | $ 1,208.93 |
| **Total Per Task Costs** | | | $ 17,314.62 | | $ 29,737.76 | | $ 18,655.06 | | $ 11,283.30 |

TOTAL COSTS (FEES ONLY) $ 76,990.74

| Reimbursable Direct Costs | | | | |
|---|---|---|---|---|
| Transportation/Per Diem (216 on- | 125 | 200 | $ 25,000.00 | |
| Air fares | 135 | 48 | $ 6,480.00 | |
| Telephone/Fax | 300 | 1 | $ 300.00 | |
| Printing | 250 | 1 | $ 250.00 | |
| Equipment/PCS | | | $ - | |
| Postage/Delivery | 250 | 1 | $ 250.00 | |
| Subtotal Other Direct Costs | | | $ 32,280.00 | |
| G & A | 23.30% | | $ 7,521.24 | |
| **Not-to-Exceed** | | | $ 39,801.24 | |

**Payment Schedule**

Task 1 and 2 - 1/6 of total to be invoiced on the 25th of each month for 6 months
Task 3 and 4 - to be invoiced at 80% upon delivery of draft plans and remaining 20% following final submission

| | | |
|---|---|---|
| Incentive for Achieving 95% of Goals | 15% of Contract Cost | $ 11,548.61 |
| Incentive for Achieving 100% of Goals | 25% of Contract Cost | $ 19,247.68 |

1 1/2% of invoiced amount late fee and interest will be charged each month on all invoices outstanding more than 30 days

Page 1 of 1